## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'23 MAY 23 PM 11:23
AV

|  |  |
|---|---|
| OSBALDO LEMUS BERRIOS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:22-cv-1651-LKG |
| SGT. GOUFF, *et al.*, | ) Dated: May 23, 2023 |
| Defendants. | ) |

### <u>MEMORANDUM OPINION</u>

Defendants Brian Gouff, Jerry Keplinger, Edward Reagan, Joshua Castle, James Hendershot, Kenneth Hardman, Robert Bush, Jeffrey West, Walter Donoway, Cindy Sebring, and the State of Maryland have filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment in response to this civil rights complaint filed by self-represented Plaintiff Osbaldo Lemus Berrios. ECF No. 25. Berrios has opposed the motion (ECF No. 33) and filed a Motion to Subpoena Videos (ECF No. 34). Defendants oppose Berrios's Motion to Subpoena Videos. ECF No. 35. The issues are fully briefed; no hearing is necessary to resolve the issues pending before the Court. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons set forth below, the Court now **GRANTS** Defendants' Motion, construed as a Motion for Summary Judgment, and **DENIES** Berrios's Motion to Subpoena Videos.

## I.    BACKGROUND

Berrios is an inmate committed to the custody of the Maryland Division of Correction and currently incarcerated at Roxbury Correctional Institution ("RCI"). In his Amended Complaint, Berrios alleges that his legal paperwork was improperly confiscated by correctional officers at Eastern Correctional Institution ("ECI") when he was transferred to Maryland

Correctional Institution – Hagerstown ("MCIH").  ECF No. 3.  He states the following regarding each of the named Defendants.

Lt. Donoway, who works at ECI, is alleged to have harassed and intimidated Berrios. ECF No. 3-1 at 34.  Berrios states that in August of 2018, he wrote administrative remedy procedure complaints ("ARPs") on Lt. Donoway "for being responsible for a man dying in the yard of his unit . . . . [h]e confiscated and destroyed the ARPs both times."  *Id.*  When Berrios reported where Lt. Donoway could find knives, he claims Lt. Donoway told the inmates who had the knives that Berrios "snitched on them."  *Id.*  When Berrios asked him why he did this, Berrios claims that Donoway said that he did not like snitches.  *Id.*  Berrios claims that Donoway then told him he should ask David Perkins how he feels about snitches.  *Id.*  According to Berrios, Donoway caused Perkins to get assaulted with a razor to his face for which he received 150 stitches.  *Id.*  Berrios believes that Donoway ordered his transfer from ECI to MCIH and states that when he arrived at MCIH, a lot of his property and all of his legal paperwork was missing.  *Id.*

Berrios states that Officer Bush, who works at MCIH, covered up the taking of his legal documents and "participated in harassment and intimidation" to cover up for other officers.  ECF No. 3-1 at 33.  Berrios claims that when he arrived at MCIH and Officer Bush unpacked his property, he told Bush that all his legal papers were missing.  *Id.* at 52.  Berrios asserts that on January 23, 2020, the "video cameras in the lobby of HU#5 will show that [he] was distracted while the cart that had all of [his] property was wheeled to a back room."  *Id.* at 51.  According to Berrios, Bush knew his legal papers were taken by other officers but did nothing to help him. *Id.*  He further claims that Bush put his life in danger by telling Officer Reagan that Berrios "paid for a missing screwdriver" and gave it to "intel."  *Id.*  Officer Reagan then told other inmates that

Berrios did this and when Berrios complained to Bush, he responded that Berrios should "leave my boy alone." *Id.*

According to Berrios, Officer Reagan is the officer who is called upon to "lean on and harass inmates because he's in control of property." ECF No. 3-1 at 42.  On an unspecified date, Berrios claims that Reagan went through his property and legal documents and gave him three choices: send it home, have it destroyed, or put it in storage. *Id.*  Berrios states he asked for certain property and paperwork, unspecified in the Amended Complaint, to be sent home. *Id.* He claims, however, that the shipment never arrived. *Id.*  During a dispute with Berrios's cellmate, Berrios recalls that Reagan called his cellmate a "dumb-ass" and remarked that, "when you look into my face, you look into Lt. Donoway's face . . . because we are the greatest, we are the Masons." *Id.* at 42.

Berrios claims that between March and May 12, 2022, while housed at MCIH, Sgt. Gouff "started his systematic harassment and intimidation" after Berrios witnessed Sgt. Gouff "in a sexual situation with an inmate." ECF No. 3-1 at 36.  Although Berrios assured Sgt. Gouff that he had not seen anything, Berrios claims that Sgt. Gouff used continuous cell searches and property inventory to harass him. *Id.*  Berrios states that, "He and his officers confiscated legal documents." *Id.*  He further states that he has a confiscation form dated March 10, 2022, for the property and the paperwork that was taken from him. *Id.*  Although the property and paperwork were supposed to be sent to his family, Berrios claims that none of the property or the legal paperwork ever reached his family's home. *Id.*  Berrios adds that another inmate, Tavon Small, was told by Sgt. Gouff and Lt. Keplinger, that Berrios had written a statement stating that Small was selling drugs and engaging in extortion placing Berrios's life in danger. *Id.*

Berrios asserts that he reported an incident to Lt. Keplinger involving "the inmate picture man," Edwin Reyes, where Reyes "made copies of my photos and sent them out to my enemies." ECF No. 3-1 at 40.  Berrios alleges that the pictures were "later sent into prison to a MS-13 gang member who was paid to kill me." *Id.*  According to Berrios, the picture was also used to set up a fake Facebook profile and Lt. Keplinger "did nothing" even though Berrios's life was in danger. *Id.*  Berrios claims that Lt. Keplinger allowed Sgt. Gouff "and everybody under him" to harass and intimidate Berrios; allowed his legal documents to be stolen; and refused to report "anything" Berrios told him.  *Id.*

Berrios alleges that Sgt. West, who works at MCIH, confiscated his property and his legal documents between March 2022 and May 12, 2022.  ECF No. 3-1 at 38.  Berrios claims that Sgt. West told him "every day that he was going to smuggle me back to Mexico" and when Berrios told him he was not Mexican, Sgt. West told him it did not matter because "we all look the same." *Id.*  Berrios alleges Sgt. West called him a "dirty Mexican" all the time and kicked his cell door, or hit his door with his key ring to "break my peace." *Id.*  He further claims that West allowed another inmate to keep his TV and X-Box game system even after Berrios showed him paperwork establishing that the items were his. *Id.*  According to Berrios, he was "forced to buy my own TV [and] X-Box back . . . for $350." *Id.*  Sgt. West allegedly told Berrios that he was being moved because he was "in Sgt. Gouff's business." *Id.*

On an unspecified date between "March 2022 [and] May 12, 2022," Berrios claims Lt. Castle came to his cell with another Lieutenant that he did not know for the purpose of harassing and intimidating him because he had filed ARPs about Lt. Donoway at ECI.  ECF No. 3-1 at 41. Lt. Castle and the other officer began searching Berrios's cell.  *Id.*  Berrios claims they were handling his property so roughly that they broke his MP-3 Player and his beard trimmers; Berrios

4

has never received compensation for the damage to his property. *Id.* During the search, Berrios claims he noticed Lt. Castle was reading his legal documents. *Id.* When he asked Lt. Castle why he was reading the documents, Lt. Castle responded that he was not reading them but was looking for "contraband or affiliations." *Id.* Berrios claims that "when they left a lot of my legal documents were gone." *Id.*

Officer Hendershot accompanied Sgt. Gouff, Officer Reagan, and Lt. Keplinger "between March 2022 and May 12, 2022" when Berrios's cell was searched. ECF No. 3-1 at 44. Berrios further claims that Hendershot, Gouff, and Keplinger attempted to bribe another inmate if he would sign a statement saying that Berrios sells drugs and engages in extortion. *Id.*

Berrios alleges that Officer Hardman[1] participated in the harassment and intimidation and covered for other officers who confiscated his legal paperwork. ECF no. 3-1 at 46.

Ms. Sebring, a case manager at MCIH, allegedly lied to Berrios and "used her position to do Sgt. Gouff's bidding." ECF No. 3-1 at 47. Berrios states that an example of this is Ms. Sebring transferring him to RCI instead of Maryland Correctional Institution- Jessup, where he was going to participate in a program. *Id.* Berrios adds that Ms. Sebring told him, "she was proud to be a part of the Mason group" and that she always made racist comments to him. *Id.*

Berrios attaches affidavits from nine other inmates who support the claims he raises. ECF No. 3-1 at 1-32. The statements provided by inmates Nathan Harrington, Robert Thomas, Branden Williams, Calvin Hill, and Darrell Mainor are not signed by the purported affiants. Generally, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Affidavits

---

[1] Officer Hardman is incorrectly identified as "Harmin" in the amended complaint.

submitted to support or oppose summary judgment may not be conclusory or based on hearsay. *See Melo v. Zumper, Inc.*, 439 F.Supp. 3d 683, 693 (E.D. Va. 2020) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).  Absent a signature indicating that the author of the statement has adopted the statement as his own, the affidavits of Harrington, Thomas, Williams, Hill, and Mainor will not be considered as evidence by this Court.

An additional issue arises in connection with the affidavit of Terrance Reaves, which is signed and notarized.  ECF No. 3-1 at 1-5.  Berrios withdrew the Reaves affidavit submitted in support of his motion seeking injunctive relief because he claims he did not know Reaves had lied about being at ECI at the same time Berrios was there.  Reaves provides a narrative regarding his contact with Lt. Donoway at ECI concerning Berrios's legal papers being confiscated that seemingly confirms all of Berrios's claims regarding the confiscation of his legal documents.  ECF No. 3-1 at 1-4, ¶¶ 1-16.  Given that the credibility of this statement has been destroyed, the affidavit will not be considered for this opinion.

The remaining affidavits are written by inmates David Perkins and Tavon Small.  ECF No. 3-1 at 6-15.  Both were signed on April 22, 2022, and both were notarized.  *Id.* at 9, 15. Perkins claims he witnessed the search of Berrios's cell that took place on March 10, 2022, by "Officer Reagan, and other officers, including Sgt. Gouff" who came to Berrios's cell with a cart.  ECF No. 3-1 at 6.  Perkins claims he was housed two cells down from Berrios on the Protective Custody Unit.  *Id.*  Perkins states that he heard Reagan using unprofessional, threatening, and foul language while he was patting Berrios and his cellmate down.  *Id.* at 7, ¶¶ 3, 4.  Berrios and his cellmate were ordered to quickly put all their property on the cart and were not permitted to look through paperwork to separate their property.  *Id.* at ¶¶ 4, 5.  Perkins further recalls that Berrios told Reagan and Gouff that he had a post-conviction hearing

scheduled for June of 2022 and wanted to make sure his legal documents were not mixed in with his cellmate's papers. *Id*. at 8, ¶ 6. Reagan and Gouff responded that Berrios was taking too long and said they would load his property on the cart if he did not speed the process up; Berrios then complied. *Id*.

Tavon Small states that he was assigned to administrative segregation by Gouff "for things I did not do, or had nothing to do with." ECF No. 3-1 at 10, ¶ 2. He further claims that Officer Hardman, who is the regular tier officer, told him that if he dropped his "lawsuit and other remedies" that Gouff would return Small to general population. *Id*. at 10-11, ¶ 4. During this conversation, Small claims that he was in Lt. Keplinger's office with Gouff when Berrios came in with a written statement accusing Small of "selling drugs, extorting people" and that he was involved in other criminal activity. *Id*. at 11, ¶ 5. Hardman told Small that this was the reason Gouff placed him on administrative segregation. *Id*. Small claims that he was released from administrative segregation after a few months and after he dropped a lawsuit he had filed. *Id*. at ¶ 9. Small states that after he was released from administrative segregation he asked Gouff and Keplinger if Berrios had made the statements Hardman claimed he made and both confirmed that he had. *Id*. at 12, ¶ 10. Small recalls that Hendershot came into the office during this conversation and said he was going to fire Berrios from being "tier rep" and move him from the cell that is close to the phone. *Id*. at ¶¶ 11, 12. He states that "a few days later" Berrios and his cellmate were moved from cell 40, which is the "first cell in the front of the tier," to cell 19, which is located in the back of the tier. *Id*. at 13, ¶ 15.

Similar to Perkins's statement, Small claims to have witnessed the March 10, 2022, search of Berrios's cell. He states that he saw officers go to Berrios's cell with "property carts." ECF No. 3-1 at 13, ¶ 16. When Small asked the inmate tier worker where they were taking

Berrios after his property was loaded onto the cart, the tier worker said they were making him destroy or send his property home. *Id.* Small states that this validated an earlier threat that Hendershot made to "further punish Berrios by taking his property too." *Id.* Later, when Berrios walked past Small's cell, Berrios told him that "the prison forced him to send his legal papers home that he needed for pending and active postconviction case that he has in June of [2022]." *Id.* at ¶ 17. Small expresses his belief that Gouff, Keplinger, Hardman, Hendershot, and Bush are trying to get Berrios hurt and told him that Berrios made false claims about him in an effort to get Small to assault Berrios. *Id.* at 14, ¶ 18. Small adds that Gouff told him, weeks later, that "him and his officer's [sic] are pure, that they are white, and that this is their country, and their prison, and nobody can change that" and that once "anybody that is not white" understands this they would be better off. *Id.* at ¶ 19. Small states that he is convinced the officers involved are white supremacists. *Id.*

In his claim against the State of Maryland, Berrios states that the State is supposed to make sure all prisons are free from the type of "criminal behavior" engaged in by the named Defendants. ECF No. 3-1 at 49. He further claims that thorough, unbiased investigations into complaints, such as those raised in his complaint, should be done but are not. *Id.* at 49-50. He states that his lawyer and his sister began sending legal documents back to him so that he could continue to work on proving his innocence and that he has a post-conviction case that has been pending since 2008. *Id.* at 52, 53. Berrios adds that on March 10, 2022, when Sgt. Gouff "put together his group for intimidation including the security chief," was the worst day of his life. *Id.* at 53.

As relief, Berrios requests the return of handwritten notes between his lawyer Rebecca Nitkin, the State's Attorney Donna Fenton, and Judge James Lee Ryan that were exchanged

"during the second trial;" return of photographs and other unspecified evidence that proves his attorney met with the State's key witness against him, Freddy Monroy; return of documents that prove Michael Lawlor worked for Freddy Monroy; and an investigation by the FBI into his claims that his efforts to successfully challenge his conviction have been thwarted by prison officials.[2]  ECF No. 3 at 5-7.  In his opposition response, Berrios adds a claim for damages of five million dollars.  ECF No. 33 at 7.

In response to this Court's Order to Show Cause why injunctive relief should not be granted in favor of Berrios, Defendants disputed a declaration submitted by Berrios that was signed by another inmate, Terrence Reaves, and explained that the legal papers Berrios sought to have returned to him had been mailed to his family in accordance with Berrios's request.[3]  ECF No. 17.  Reaves claimed that during January of 2020, he was an "Inmate Worker in ECI's Admin. Seg. Building."  ECF No. 7-2 at 1, ¶ 2.  He claims that Lt. Donoway told him that Berrios, who was assigned to protective custody at that time, would be transferred out of ECI the next day and that Reaves "and the other General Population workers" would be processing boxes of Berrios's property.  *Id.* at ¶ 7.  Reaves further claimed that Donoway instructed him to "locate any piece of paper that was in the property, and to separate any piece of paper from the rest of the property and to place it into a separate box."  *Id.* at ¶ 8.  According to Reaves, Donoway specifically told him to look for legal documents.  *Id.*  After Reaves did what he was allegedly ordered to do while Berrios "was distracted in the office," he claims that he saw that the "box of papers" was not sent out of ECI even though Berrios was no longer there.  *Id.* at ¶¶ 13, 14. Defendants, however, provided evidence that Reaves was not housed at ECI at the same time

---

[2] This Court has no authority to order the FBI, an executive agency, to investigate Berrios's claims.

[3] Berrios also submitted an affidavit from Reaves as an exhibit to the amended complaint.  ECF No. 3-1 at 1-5.

Berrios was; rather, Reaves was at ECI from September 21, 2018, to July 3, 2019. ECF No. 17-3 at 3-4. Berrios later retracted Reaves's statement and claimed he had no knowledge that Reaves was lying. ECF No. 20 at 3. This Court denied injunctive relief as moot based on Defendants' assertions that they were no longer in possession of the property at issue. ECF No. 19.

Defendant Donoway states in his declaration that he has no recollection of ordering a search of Berrios's cell while he was at ECI. ECF No. 25-3 at ¶ 3. He explains that if he had approved or ordered a search of Berrios's cell, the search would have been a "routine, random search, . . . or the result of specific intelligence related to contraband or a crime." *Id.* According to Donoway, when a cell search is performed, "the inmates are taken out of their cell, placed in handcuffs, and seated in a chair outside the cell so that they can watch the search." *Id.* at ¶ 4. When the inmates who occupy the cell cannot be present during the search, "a search may proceed only if two Correctional Officers are present to sign off on the search." *Id.* Any contraband uncovered during a search is "inventoried in the Notice of Rule Infraction issued to the inmate occupant of the cell." *Id.* at ¶ 5. No documentation is provided when no contraband is discovered. *Id.*

When an inmate is transferred his property would have been removed from his cell, "placed on a cart, and taken to the Property Room, where it is sorted and inventoried with the inmate present." ECF No. 25-3 at ¶ 7. The inventory of the inmate's property is documented on a "Personal Property Inventory Sheet." *Id.* Pursuant to his January 24, 2020, transfer from ECI to MCIH, Berrios's property was inventoried on January 17, 2020; the Personal Property Inventory Sheet was signed by Berrios and an officer. *Id.* The inventory sheet reflects that Berrios had books and legal papers during the January 17, 2020, inventory of his property. *Id.* at ¶ 9. Donoway specifically denies participating in the search or inventory of an inmate's personal

property, and states he has "never rummaged through an inmate's legal or personal documents." ECF No. 25-3 at ¶ 8. Additionally, Donoway reports that: he has no knowledge of any formal complaint filed against him by Berrios; does not personally know any officers who work at MCIH; did not communicate with any officers at MCIH about Berrios; provides any inmate reports he receives regarding other inmates, safety, or weapons to the Intelligence Department; does not share such reports with other inmates; and has never torn up an ARP given to him by an inmate, nor has he threatened an inmate regarding an ARP or pressured an inmate to refrain from filing an ARP. *Id.* at ¶¶ 16-19.

Sgt. Gouff states that on March 22, 2022, he was the Sergeant in Charge of the protective custody unit where Berrios was housed at MCIH. ECF No. 25-4 at ¶ 3. He explains there is an annual inventory taken at MCIH for the purpose of locating and identifying "excess property." *Id.* at ¶ 4. On March 10, 2022, the three-day annual property inventory for the tier where Berrios was housed began. *Id.* at ¶ 5. "Berrios was found to have excess property, including excess clothes, food, and paperwork." *Id.* at ¶ 6. All inmates confined to the Maryland Division of Correction are limited to 1.5 cubic feet of books and papers, which includes legal papers. ECF No. 25-3 at ¶ 7. Excess property may be mailed to an outside address, destroyed, or donated, as the inmate chooses. ECF No. 25-4 at ¶ 7. Berrios chose to have his excess property sent to an address in Hyattsville, Maryland. *Id.* According to documentation provided by Defendants, the package containing Berrios's excess property was sent via FedEx on May 16, 2022, with a tracking number of 776869473244. ECF No. 17-4 at 9. When that tracking number is entered into the FedEx tracking system, it shows that the 45-pound package was delivered on May 19, 2022, at 11:54 a.m. *See* https://www.fedex.com/en-us/tracking.html (last viewed May 17, 2023).

Gouff states he "was not personally involved with the property inventory but was a sergeant who oversaw the operation." ECF No. 25-4 at ¶ 8. He further states that Lt. Keplinger and Lt. Castle were also supervising the annual inventory but to his knowledge, neither personally inventoried any inmate property, nor did they interact with Berrios. *Id.* Gouff asserts that Berrios actually wrote letters[4] to him praising his work as a correctional officer and explains he does not know why Berrios wrote the letters because Gouff did not ask him to do so, nor did he supply the letters to anyone else. *Id.* at ¶ 10. Gouff denies ever speaking to any officer at ECI about Berrios and states he was never made aware that Berrios's property was stolen. *Id.* at ¶¶ 12-14. Gouff further asserts that he has never advised Berrios, or any other inmate, not to "cause problems for correctional officers" nor did he "otherwise threaten" Berrios. *Id.* at 15. Gouff maintains that he takes "all inmate safety concerns very seriously" and if Berrios had an enemy at MCIH or feared for his safety, Gouff would have addressed it immediately. *Id.*

## II.    STANDARD OF REVIEW

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.,*

---

[4] Defendants do not provide copies of these letters as exhibits.

534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

While self-represented pleadings are liberally construed, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), this Court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

In addition to his opposition response, Berrios filed a Motion to Subpoena Videos (ECF No. 34) which Defendants have opposed (ECF No. 35). Berrios seeks to have "all videos that Defendants hold or hide or display" subpoenaed for consideration in the context of this case. ECF No. 34. He states that he needs videos from ECI and MCIH to prove his claims but does not specify dates, locations, or times for such videos. *Id.* Defendants oppose the request as overly broad. ECF No. 35.

Federal Rule of Civil Procedure 56(d) provides that:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:

  (1) Defer considering the motion or deny it;
  (2) Allow time to obtain affidavits or declarations or to take discovery; or
  (3) Issue any other appropriate order.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49. However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011), *rvs'd on other grounds*, (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

15

Berrios's request for all surveillance video at ECI and MCIH is overly broad.  The burden

such a request would place on Defendants to produce the innumerable hours of surveillance video

and on this Court to view the video is completely unsupported by any specific purpose or need.

Further, proof that certain Defendants conducted searches of Berrios's cells at ECI and MCIH is

immaterial to any claim of a denial of access to the courts; failure to protect from violence;

harassment; or denial of due process.  "[G]iven a valid conviction, the criminal defendant has been

constitutionally deprived of his liberty to the extent that the State may confine him and subject him

to the rules of its prison system so long as the conditions of confinement do not otherwise violate

the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515

U.S. 472, 493 (1995) (requiring an atypical and significant hardship as prerequisite to creation of

a constitutionally protected liberty interest).  Searches of an inmate's property and limiting the

amount of property they are allowed to keep, are well within the parameters of the acceptable

norms of incarceration.  Therefore, the requested discovery would not establish a dispute of

*material* fact and the Motion to Subpoena Videos is denied.

## III.   ANALYSIS

In their Motion, Defendants assert they are entitled to Eleventh Amendment immunity; the

complaint is subject to dismissal for failure to exhaust administrative remedies; the complaint fails

to state a claim upon which relief may be granted; Berrios has failed to state an Eighth Amendment

claim for failure to protect him from violence; there has been no violation of Berrios's due process

rights; and the retaliation claim fails because no constitutional right is implicated in the claim.

ECF No. 25-1.  In his opposition response, Berrios asserts that Defendants should not be able to

avail themselves of Eleventh Amendment immunity because they have broken the law; that any

failure to exhaust administrative remedies was caused by the confiscation of his legal documents

on March 10, 2022; and that Defendants have not been honest in their response to the complaint. ECF No. 33.

A.    **Eleventh Amendment Immunity**

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Florida Department of Health v. Florida Nursing Home Assn.,* 450 U.S. 147 (1981) (*per curiam*)). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). Berrios's claim against the State of Maryland is barred by the Eleventh Amendment and must be dismissed.

Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Although Berrios does not specify whether he is suing Defendants in their official capacity, to the extent he is doing so, Defendants are immune from suit for actions taken in their official capacity and the claims are dismissed.

### B.     Exhaustion of Administrative Remedies

Defendants raise the affirmative defense that Berrios has failed to exhaust his

administrative remedies.  If Berrios's claims have not been properly presented through the

administrative remedy procedure, and that failure is not attributable to factors outside his control,

they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C.

§ 1997e.  The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983
> of this title, or any other Federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative remedies as are available
> are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or

detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent

for, violations of criminal law or the terms and conditions of parole, probation, pretrial release,

or diversionary program." 42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses

"all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed.

Appx. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement

and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to

exhaust administrative remedies is an affirmative defense to be pleaded and proven by

defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Custis v. Davis*, 851 F.3d 358,

361 (4th Cir. 2017).  Nevertheless, a claim that has not been exhausted may not be considered by

this Court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*,

578 U.S. 632, 639 (2016).  Therefore, a court ordinarily may not excuse a failure to exhaust.

*Ross*, 578 U.S. at 639 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he

mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his

administrative remedies.  *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see*

*Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made

clear that exhaustion is now mandatory.").  Exhaustion requires completion of "the

administrative review process in accordance with the applicable procedural rules, including

deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  This requirement is one of "proper

exhaustion of administrative remedies, which 'means using all steps that the agency holds out,

and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548

U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in

original).  But the court is "obligated to ensure that any defects in [administrative] exhaustion

were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*,

478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process

that must be exhausted.  Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018).  First, a prisoner must

file an ARP with the warden within 30 days of the incident at issue.  Md. Code Regs.

§ 2.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs.

§ 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual

responsible for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B)

(setting the 30-day deadline).  Second, if the ARP is denied, or the inmate does not receive a

timely response, a prisoner must file an appeal with the Commissioner of Correction within 30

days.  Md. Code Regs. § 12.02.28.14(B)(5).  If the appeal is denied, the prisoner must appeal

within 30 days to the Inmate Grievance Office ("IGO").  *See* Md. Code Ann., Corr. Servs.

§§ 10-206, 10-210; Md. Code Regs. § 12.07.01.05(B).  Inmates may seek judicial review of the

IGO's final determinations in a Maryland Circuit Court.  *See* Md. Code Ann., Corr. Servs. § 10-

210(a).

      An inmate need only exhaust "available" remedies.  42 U.S.C. § 1997e(a).  In *Ross v.*

*Blake*, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion

as inconsistent with the PLRA."  *Id.* at 635.  In particular, it rejected a "special circumstances"

exception to the exhaustion requirement.  *Id.*  But, it reiterated that "[a] prisoner need not exhaust

remedies if they are not 'available.'"  *Id.* at 636.  An administrative remedy is available if it is

"'capable of use' to obtain 'some relief for the action complained of.'"  *Ross*, 578 U.S. at 642

(quoting *Booth*, 532 U.S. at 738).  The *Ross* Court outlined three circumstances when an

administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does

not come into play."  578 U.S. at 643.  First, "an administrative procedure is unavailable when

(despite what regulations or guidance materials may promise) it operates as a simple dead end—

with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*

Second, "an administrative scheme might be so opaque that it becomes, practically speaking,

incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary

prisoner can discern or navigate it."  *Id.* at 643-44.  The third circumstance arises when "prison

administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation."  *Id.* at 644.

      F. Todd Taylor, the director of the IGO, provides a declaration stating that Berrios filed

five appeals concerning ARPs that were dismissed.  ECF No. 25-5 at 1, ¶ 3.  Relevant to this

case, Berrios filed an appeal of an ARP ("IGO 20220620") in which he complained of retaliation by Sgt. Gouff. *Id.* at ¶ 4.  On June 15, 2022, Berrios was notified that his appeal would be dismissed if he did not provide "necessary documentation regarding his claim" which included the original ARP with the Warden's response, the receipt from the Warden, the appeal to the Commissioner including their response, and the receipt from the Commissioner.  *Id.* at ¶ 4; pp. 4-5 (letter from Robin Woolford to Berrios).  Because Berrios did not supply the necessary paperwork within the specified time frame, his IGO appeal was dismissed.  *Id.*

In two additional appeals, Berrios complained about missing or stolen property ("IGO 20220380" and "IGO 20220383") and in two letters dated May 20, 2020, Berrios was advised that he needed to provide the paperwork documenting the ARP he filed, the receipts from the Warden and the Commissioner, and their responses.  ECF No. 25-5 at 1, ¶¶ 5, 6; pp. 6-9.  Berrios again did not provide the necessary documents within the 30-day period provided and his case was dismissed.  *Id.* at ¶¶ 5, 6.

Berrios's amended complaint makes clear that on March 10, 2022, his legal papers were removed from his possession.  Taking this allegation as true, Berrios's efforts to appeal his ARPs to the IGO were thwarted by correctional staff, making his compliance with the IGO directives to provide paperwork impossible.  Thus, there is a genuine dispute of material fact regarding Berrios's exhaustion of administrative remedies precluding dismissal of the complaint on that basis.  Accordingly, the Court reaches the merits of his claims.

### C.    Access to Courts

Berrios appears to frame his allegation that he was denied access to courts as a due process claim, rather than one arising under the First Amendment.  Although inartfully pled,

Berrios's claim is appropriately analyzed under the First Amendment.[5]  Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 821 (1977).  However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355).  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches."  *Lewis*, 518 U.S. at 349.  Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts.  *Id.* at 399.  Conclusory allegations are not sufficient to establish actual injury.  *See Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir. 2006) (denying access to court claim based on allegation that petition for a writ of certiorari had, for unspecified reasons, been dismissed and where plaintiff did not even mention the point on appeal).

---

[5] "The Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm.  Rather '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Evans v. Chalmers*, 703 F.3d 636, 647 n. 2 (4th Cir. 2012).

For a viable access to courts claim, Berrios must establish that his underlying claim was "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 416 (footnote omitted). A prisoner's right to access the courts does not include the right to present frivolous claims. *Lewis v. Casey*, 518 U.S. at 353 n.3. It is not enough that a prisoner is prevented from challenging his conviction. He must also show that his claim had merit.

Here, Berrios alleges that his legal papers are necessary to establish his actual innocence in a post-conviction proceeding. He states, repeatedly, that he has been incarcerated for twenty years for a crime he did not commit and claims the person who committed the murder was his employee, Freddy Monroy. Assuming Berrios has a valid claim, there is evidence that he has not been deprived of his legal paperwork by these Defendants. Rather, the documents were mailed to an address of his choosing and were delivered to that address. *See* https://www.fedex.com/en-us/tracking.html (last viewed May 17, 2023) (indicating a package mailed from MCIH was delivered on May 19, 2022 at 11:54 a.m.). Additionally, Berrios admits that his family sent at least some of the documents back to him. To the extent Berrios was unsuccessful in the challenge to the validity of his conviction, it does not appear that the lack of documents was the reason for that failure. Further, Berrios does not explain with any specificity how those documents prove he did not commit the crime, nor does he state whether he was proceeding *pro se* in the post-conviction proceeding challenging his conviction. Thus, Defendants are entitled to summary judgment on the access to courts claim asserted.

### C.   Failure to Protect

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Berrios must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).  The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.  Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837.  A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence'" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Berrios's claims that Defendants told other inmates that he reported them for selling drugs and extortion and that, as a result of Defendants' conduct, he was targeted by the MS-13 gang.  Berrios's claims are, however, undermined by the statements he provides from the inmate he allegedly falsely accused.  Tavon Small states in pertinent part that he did not believe Berrios reported him out of any ill-will.  Thus, to the extent Berrios claims that Defendants endangered his life by reporting his activities, his own evidence disputes that allegation.  Further, the generalized claim that a gang has targeted Berrios for assault does not appear to implicate a

specific, known risk of harm which Defendants should have known. Moreover, Berrios was confined to protective custody during the time relevant to the complaint. It is difficult to imagine any other measures Defendants could have taken to ensure his safety. Defendants are entitled to summary judgment on this claim.

### E.    Retaliation

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017). A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a

person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858

F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500).

Berrios must also demonstrate a causal connection between his First Amendment activity

and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based

on circumstantial evidence, such as evidence that the defendant was aware of the First

Amendment activity and that the retaliation took place within some "temporal proximity" of that

activity. *Id.*

Berrios has not made such a showing. Rather, he attributes the alleged retaliatory actions

to Defendants' membership in the Masons and to their alleged racism. Conclusory claims

regarding nefarious motives, without a connection to a legitimate exercise of a constitutionally

guaranteed right, are not a valid basis for a retaliation claim. In the prison context, courts "treat

[claims of retaliation] with skepticism because 'every act of discipline by prison officials is by

definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v.

Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir.

1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege

facts that support the claim of retaliation. *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989).

Moreover, a retaliation claim fails if there is a legitimate reason for the alleged retaliatory action.

*Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Defendants have

provided a legitimate reason for searching Berrios's cell and for requiring him to mail his excess

property to an outside address. Defendants are therefore entitled to summary judgment on this

claim.

## IV.     CONCLUSION

By separate Order which follows, Defendants' Motion to Dismiss, or in the alternative, for Summary Judgment, construed as a Motion for Summary Judgment, is **GRANTED** and Berrios's Motion to Subpoena Videos is **DENIED**.

LYDIA KAY GRIGGSBY
United States District Judge